UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. |
| SEVENTY-FOUR THOUSAND, NINE HUNDRED EIGHTY-SEVEN DOLLARS IN U.S. CURRENCY ($74,987.00), | ) ) ) ) |
| Defendant. | ) ) |

**VERIFIED COMPLAINT OF FORFEITURE**

COMES NOW, Plaintiff, United States of America, by and through its attorneys, Sayler A. Fleming, United States Attorney for the Eastern District of Missouri, and Lindsay McClure-Hartman, Assistant United States Attorney for said district, and for its Verified Complaint for Forfeiture states as follows:

**NATURE OF THE ACTION**

1. This is a civil action *in rem* brought by the United States of America seeking forfeiture of all right, title and interest in the above captioned defendant property pursuant to Title 21, United States Code, Section 881(a)(6), and Title 18, United States Code, Sections 981(a)(1)(A) and (C).

2. The defendant property was seized by law enforcement on or about October 19, 2020, and is more fully described as seventy-four thousand, nine hundred eighty-seven dollars in U.S. currency ($74,987.00).

## JURISDICTION AND VENUE

3. The Court has jurisdiction over this action pursuant to Title 28, United States Code, Sections 1345, 1355, and 1395.

4. Venue is proper pursuant to Title 28, United States Code, Section 1355(b)(1)(A) because the acts and omissions giving rise to forfeiture took place in the Eastern District of Missouri. Venue is also proper pursuant to Title 28, United States Code, Section 1395(b) because the defendant currency was seized in the Eastern District of Missouri.

## STATUTORY FRAMEWORK

5. Title 21, United States Code, Section 881(a)(6) authorizes the civil forfeiture of "all moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter."

6. Title 18, United States Code, Section 1956(a)(1)(A)(i) criminalizes conducting a transaction, including transferring, delivering, or other disposition, knowing that such transaction represents the proceeds of some form of unlawful activity and that in fact involves the proceeds of a specific unlawful activity, including violations of the Controlled Substances Act, with the intent to promote the carrying on of the specified unlawful activity.

7. Title 18, United States Code, Section 1956(a)(1)(B) criminalizes conducting a transaction, including transfer, delivery, or other disposition, knowing that such transaction represents the proceeds of some form of unlawful activity and that in fact involves the proceeds of a specific unlawful activity, including violations of the Controlled Substances Act, knowing that

the transaction is designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of specified unlawful activity.

8. Pursuant to Title 18, United States Code, Section 981(a)(1)(A), any property, real or personal, involved in a transaction or attempted transaction in violation of section 1956 of Title 18, or any property traceable to such property, is subject to civil forfeiture.

## FACTS GIVING RISE TO FORFEITURE

9. On or about October 19, 2020, law enforcement officers observed Antawan Simmons ("Simmons") and Johnathan Caffey ("Caffey"), both residents of St. Louis, Missouri, acting suspiciously near gate C15 at St. Louis-Lambert International Airport.

10. Caffey has previous felony charges for possession of a controlled substance, distribution of narcotics, burglary, and robbery.

11. Gate C15 was in the process of boarding a flight to Seattle, Washington. Investigators observed Simmons walk to gate C15, pause, then continue to walk to the end of the concourse. He then walked back, paused again at gate C15, and continued to walk to the opposite end of the concourse. Simmons then went into a store with Caffey. They both exited the store and walked to gate C15.

12. The boarding was complete for gate C15 and the door to the plane was closed by the gate agent. Simmons and Caffey stopped at Gate C15. Caffey then walked to a nearby restaurant and Simmons attempted to board the flight.

13. Investigators approached Simmons and he consented to questions about his travels. Simmons stated he bought his one-way ticket on the day of his travel and was travelling alone. When asked about the purpose of his travel, he said he was going to hang out and see the sights.

14. Investigators asked Simmons if he had any illegal drugs or weapons and he said no.

He consented to a search of his carry-on bag and it contained no illegal contraband. Investigators asked Simmons if he had checked any luggage and he said yes.

15. Investigators asked Simmons if he had anything illegal in his checked suitcase and he said no. Investigators then asked if he had any large amounts of currency in his checked suitcase and he did not answer. Investigators asked if the currency might total ten or fifteen thousand dollars and Simmons responded, "Something like that." When investigators asked Simmons to be more specific about the currency, he did not answer. Investigators asked Simmons if he knew how much money he had in the checked suitcase and he shook his head no. Simmons then said he was planning on looking at cars and possibly relocating to the Seattle area.

16. When investigators asked how he earned the cash in his possession, Simmons stated he was a professional fighter but had not had a fight in two years. When asked how much he earned from his last fight, Simmons did not answer. While being questioned, Simmons continued to look around him as if he was searching for someone.

17. Simmons then consented to a search of his checked suitcase. Airline agents retrieved the bag.

18. Investigators asked to look at Simmons' airline ticket. While speaking with Simmons, they discovered Simmons and Caffey purchased their tickets eight hours before the flight departure time and they were travelling together.

19. Caffey arrived back at gate C15. Investigators approached Caffey and he consented to an interview. They asked Caffey if he had a checked suitcase and he said no. When asked again, he said he did have a checked suitcase. While speaking to investigators, Caffey appeared to be very nervous and continuously dropped items he was holding.

20. Investigators asked Caffey if he had anything illegal or any large sums of currency

4

in his suitcase and he said no.

21.     Investigators asked Simmons how much currency was in his suitcase and he said about seventy. Investigators asked if that meant seventy thousand and Simmons said yes. When asked about the difference between that and the fifteen thousand he told them earlier, Simmons did not answer.

22.     Investigators asked Simmons for the combination to the lock on his suitcase. As he was giving the combination (he said it was zero zero zero), Caffey stated Simmons did not have to give his consent to open the suitcase. When investigators asked Simmons to open the suitcase, he refused.

23.     Airline agents then retrieved Caffey's suitcase. Caffey's suitcase was a larger version of Simmons' suitcase and they appeared to be a set.

24.     Investigators asked Caffey if he would consent to a search of his suitcase and he said no. He said there was nothing in his suitcase and there was no reason for investigators to look inside. He said he had never been arrested and he did nothing wrong.

25.     During the interview, Caffey stated he could prove what was in the suitcase but wouldn't open it or consent to a search. When asked about his employment, Caffey stated he owned his own business and could call one of his employees. He would not elaborate on the type of business he owned or his income.

26.     Another officer arrived on the scene and deployed a trained, certified, and reliable drug detection canine for a free air sniff on both suitcases. The canine alerted positively to the presence of a controlled substance on both suitcases.

27.     Due to the vague and misleading comments of Caffey and Simmons, their attempts to conceal the contents of the suitcases and the positive canine indication, investigators informed

5

Caffey and Simmons their suitcases would be seized and they would be seeking search warrants. Investigators provided Caffey and Simmons with receipts for the suitcases.

28. Caffey and Simmons were able to continue their travels and they chose not to fly to Seattle.

29. The suitcases were transferred to the non-drug evidence custodian at the Drug Enforcement Administration in St. Louis, Missouri.

30. On October 21, 2020, investigators obtained a federal search warrant within the Eastern District of Missouri.

31. Investigators opened Caffey's suitcase and found multiple large bundles of U.S. currency, some hidden in the pockets of multiple pieces of clothing. The currency totaled $74,987.00, was banded together in rubber bands and consisted of mainly $20 bills.

32. Investigators opened Simmons' suitcase and found multiple large bundles of U.S. currency, some hidden in the pockets of multiple pieces of clothing. The currency totaled $79,480.00, was banded together in rubber bands and consisted of mainly $20 bills.

## COUNT ONE – FORFEITURE
## 21 U.S.C. § 881(a)(6)

33. The United States incorporates by reference the allegations set forth in Paragraphs 1 to 32 above as if fully set forth herein.

34. The defendant property is bulk U.S. currency that was discovered in rubber-banded bundles inside a checked suitcase, brought to the airport by Caffey. A trained, certified and reliable narcotics canine alerted to the presence of a controlled substance on the defendant property.

35. Based on the foregoing, the defendant property is subject to forfeiture pursuant to Title 21, United States Code, Section 881(a)(6) as money furnished or intended to be furnished in exchange for a controlled substance, as proceeds traceable to such an exchange, and as money to

be used to facilitate a violation of the Controlled Substances Act.

## COUNT TWO – FORFEITURE
## 18 U.S.C. § 981(a)(1)(A)

36. The United States incorporates by reference the allegations set forth in Paragraphs 1 to 32 above as if fully set forth herein.

37. The defendant property is proceeds of an unlawful activity involving controlled substances and was transported through the Eastern District of Missouri by Caffey with the intent to promote the carrying on of, and to conceal or disguise the nature, location, source, ownership or control of, a specified unlawful activity.

38. Based on the foregoing, the defendant property is subject to forfeiture, pursuant to Title 18, United Stated Code, Section 981(a)(1)(A) as property involved in a transaction or attempted transaction in violation of Title 18, United States Code, Section 1956, or as property traceable to such property.

## PRAYER FOR RELIEF

WHEREFORE, the United States of America prays that a Warrant for Arrest be issued in rem for the defendant property and the defendant property be condemned and forfeited to the United States of America, in accordance with the provisions of law; and that the United States of America be awarded its costs in this action, and have such other relief as provided by law and the nature of the case may require.

Respectfully submitted,

SAYLER A. FLEMING
United States Attorney


*/s/ Lindsay McClure-Hartman*
LINDSAY MCCLURE-HARTMAN, #66070(MO)
Assistant United States Attorney

        111 South 10th Street, Suite 20.333  
        Saint Louis, Missouri 63102  
        Telephone:   (314) 539-2200  
        Facsimile:    (314) 539-2777  
        Lindsay.McClure-Hartman@usdoj.gov

## **VERIFICATION**

I, Task Force Officer Walter M. Holman, hereby verify and declare under penalty of perjury that I am a Task Force Officer with the Drug Enforcement Administration, that I have read the foregoing Verified Complaint in rem and know the contents thereof, and that the matters contained in the Verified Complaint are true to my own knowledge, except that those matters herein stated to be alleged on information and belief and as to those matters I believe them to be true.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information supplied to me by other law enforcement officers, as well as my investigation of this case, together with others, as a Task Force Officer of the Drug Enforcement Administration.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: ___4.19.21___
                   (date)

_[signature]_
Walter L. Holman
Task Force Officer
Drug Enforcement Administration